Good morning, Your Honors. May it please the Court, my name is Shane McKenzie of Quinn Emanuel. Wait a second. Oh, I'm sorry. All right. We're very good looking, but there's no flash photography in the courtroom. Go ahead, please. May it please the Court, my name is Shane McKenzie of Quinn Emanuel, and I represent the Petitioner, Mr. Sylvester Owino. I will seek to preserve three minutes for rebuttal. Mr. Owino has chosen to remain in prison for the last eight years because he is convinced that he will be tortured and killed if he is returned to Kenya. The central issue in this case is whether or not it is more likely than not that Mr. Owino will be tortured if he's returned. And that central question has not been answered by either the judge or the board. If you look at the board's findings with respect to the torture claim, all that was found was that the board agreed with the judge's determination. And with respect to the judge's order, all that was found were three findings with respect to the torture claim. First, that police in Kenya are corrupt and that, in fact, corruption is endemic and that they do torture prisoners and detainees. But she found that Mr. Owino had not provided evidence stating that the government would torture him as a result of his civil rights activism for women. And then also found that Mr. Owino had not provided evidence that the police would torture him as a result of statements that he had made in 1997. The center of this case are the documents submitted by Mr. Owino and then ostensibly discredited by the government. In other words, if in fact the documents submitted by Mr. Owino were fraudulent, then wouldn't the judge have sufficient reason to make an adverse credibility determination? No, Your Honor. They would not, because there was no finding that Mr. Owino knew that the records were fraudulent. And if you look at the Yemane-Berner case, which was referred to – I'm sorry. Which case did you say? I might not pronounce it right, but it's Yemane-Berner, I believe. Oh, okay. Yeah. But it's a little bit different here, because Mr. Owino says, I was arrested. And I've got a document that shows I was arrested. And the government – well, let's put aside the issue of whether or not they proceeded properly in obtaining it. The government comes back with a document that says, you were never arrested. He says, I was in the hospital. And they come back with something that says, you were never in the hospital. That's different than whether or not he's – whether or not the documents itself give rise to an adverse credibility determination. That's – that's proof that he's not telling the right story. So it seems to me that if these documents were appropriately admitted in the case or appropriately relied on, they would support an adverse credibility determination. To me, the center of the case is where – is the procedure in their – of obtaining the documents and admitting them. But tell me why I'm wrong. Okay. Your Honor, respectfully, I do believe that you're wrong. Because based on the case of Humane Bear, there must be a specific finding that the person knew the documents were fraudulent. And in this case, there was a specific finding that the documents were, in fact, sent from Kenya. In the Humane Bear case, it was a very similar fact pattern where the mother had sent the documents, and there was no finding that the daughter actually knew whether or not the documents were fraudulent. We're misunderstanding each other. And I do want you to get on to the other point. But let me tell you what I'm saying. I'm saying he may not be penalized for submitting fraudulent documents if he didn't know they were fraudulent. But he submitted these documents in corroboration of his claim that he was arrested and beaten and thereafter treated. And what the government submitted were documents that I think can be read to say there's no evidence that he ever was arrested. There's no evidence that he ever was treated. And don't those documents that the government submitted, which are not fraudulent, they may have been inappropriately obtained, don't they cast doubt on his credibility? I guess two points. First, with respect to the documents, I'm losing my train of thought. I apologize. I'm sorry. Can you repeat the question? Sure.  Go ahead. There's a difference between corroboration and credibility. And so I believe in your hypothetical what you're saying is that those documents wouldn't have corroborated his? Well, I'm asking more. I think the documents, at least on their face, may contradict his story, his testimony, which is to say the hospital says we don't have any evidence that he ever was here. Your Honor, that's not what the documents say. He says I was. Okay. Your Honor, in terms of the fraudulent aspect of the documents, the government's records or the investigation only had to do with the warrant evidence. It had nothing to do with the medical evidence. Okay. There were no documents submitted saying that he never received medical care. There were documents submitted that were not alleged to be fraudulent that said he did get medical treatment. Yes. Yes. In fact, there was the letter from the doctor that was never alleged to be fraudulent and there were the medical records themselves that were never alleged to be fraudulent. The records alleged to be fraudulent are things relating to the arrest and the arrest warrants. Right. And the sole basis for finding that they were fraudulent is based on the investigation that was conducted by the police at the stations where he was alleged to be tortured. Well, I want to talk about that separately, but let's assume again that they come back with a letter that says no evidence of arrest. We've checked our – we've checked – the police have checked and there's no evidence of arrest. Does that – is that evidence on which an adverse credibility determination can be based? No, Your Honor, because that evidence cannot be considered in this case for a variety of reasons.  So your case really turns on whether this evidence can be considered, right? My case turns on whether or not – Whether or not the evidence obtained by the government investigators can be considered. No, Your Honor. And that's what I was starting to start the case with. So – so – Even if he's found not credible and even if he was never tortured in the past, he's still entitled to relief under the Convention against Torture because the evidence establishes that he will be tortured in the future simply by virtue of the fact that he will be arrested if he's returned to Kenya. And there are a host of cases that state that, that even if prior – prior acts of torture are not corroborated or even if the person is found to be not credible, then the – the judge and the board must evaluate the evidence and – and the claim that he's going to be tortured for nonpolitical reasons. So wholly apart from your 208.6 argument and any due process argument, you say even if – let's assume we rejected those arguments and found that the investigation and the submission of the government – of the – of the documents by the government was okay, your – your position is that on this record, we should do what? On this record, there – there needs to be a finding from the board as to whether or not Mr. Owino will be arrested, because the government does not even dispute the fact that if he is going to be arrested when he's returned to Kenya, that he will be – there's a likelihood that he will be tortured. So you would have us do what? Remand to the board for a finding on whether or not he would be arrested if he returns to? Yes, Your Honor. Under that hypothetical, if all the other arguments are – are rejected and none of the evidence that supports the fact that – that he actually will be tortured is – is considered, then the board needs to determine that. Okay. But is that all that – I mean, is that – is that all we – we have to do? In other words, your argument under Kat is there was – there was evidence. It wasn't properly considered. Substantial evidence does not support the denial of Kat. We could remand saying that and have a hearing on Kat alone. What about all this other stuff? Do we just forget about that, or do you need some relief there, too? No, sir. I mean, Your Honor, the credibility finding also needs to be reversed, because he needs to be able to put that evidence on, and there needs to be a new hearing to address – to address the Kat claim fully. What evidence? To lay out the repeated errors of both fact and law that – What evidence do you – he needs to put that evidence on? He said, what evidence do you want him to put on? Do you want him to be able to – let's assume they do the same thing. They have a report. The government did a report. They contracted with former Kenyan police as government contractors to do the report. The former Kenyan police went to Kenya and talked to the present Kenyan police, and none of those people were available for cross-examination. I just want to make one correction. The report was actually written by a Kenyan police officer, not – not a foreign service. Current. Current. Rose Karanja. What was the role of the former officers who were – With respect to the report, and I forget the page number of it, he mailed the letters to her, and she wrote the report. And then the lady picked it up. In other words, unlike some of the other cases that we've seen this week and that come before the Ninth Circuit all the time, you don't have DHS investigators doing a report and DHS investigators being available to be cross-examined about their report. The people that actually did the report were current Kenyan police officers. Yes. And were not available for cross? No. Let me ask you a question just so I understand the record. Am I right in thinking that the U.S. government employees who dealt with the local contractors, if you will, were available for examination? Yes. The U.S. officers had no involvement with the investigation whatsoever. The Foreign Service nationals did have some involvement. Right. And that was my next question. Were they available for cross-examination also? They were made available for cross-examination. But the individuals from the Kelomani police station and from the Bar-Ober police station who actually were the ones who gathered the information, they were not made available. And Mr. O'Weno requested that they be made available for cross-examination. What specifically do you want us to do? Well, I would posit that the evidence in the record compels the conclusion that Mr. O'Weno will be arrested if the evidence was properly considered and also compels the conclusion that if he's arrested, he would be tortured. And on that level, that this Court can just simply defer removal. However, if you look at the case of Haley, it's a Ninth Circuit case. If the evidence compels the conclusion that the petitioner will be tortured upon removal, then, yes, you can do that. In this case, is your position that the IJ could not reach any conclusion on the evidence in front of him, I think, in this case, but that Mr. O'Weno would be arrested and tortured if returned? If properly considered, yes, Your Honor. I would say that the evidence in the record compels the conclusion that Mr. O'Weno will be arrested if the evidence was properly considered. For example, some of the evidence that was just not, that didn't make her way into her ruling was the evidence of Mr. O'Weno's brother, who the judge found, at least with respect to certain parts of his testimony, to be credible. He stated that he had gone back to Kenya, that the police were still looking for Mr. O'Weno, and also that Mr. O'Weno's brother had been murdered by the police. And none of this was considered by the judge in ruling. Could you return to the 208.6 issue? And I know that Engle on the due process side gives you some difficulty, but you make a statutory argument here also, or a regulatory argument. What should we do if 208.6 has been violated? What's the appropriate remedy? The remedy, Your Honor, would be to remand such that a few things are considered first, the new evidence relating to the possibility of torture, which is that as a result of the breach of this violation and as a result of the disclosure of these documents to the Kenyan police who are alleged to have tortured Mr. O'Weno, there is an increased risk that these specific police officers will retaliate. And there's plenty of country report evidence to suggest that the police will retaliate. And the BIA on that one said, well, that might be a good argument in the abstract, but in this case, Mr. O'Weno said he had his sister go to the police station or bribe people to get these very reports in the first place, the ones we're trying to rebut. Weren't the Kenyan police already on notice of that he was trying to document his treatment for purposes of asylum? No, Your Honor. I mean, in fact, it would be the opposite conclusion, right? If the police felt that Mr. O'Weno was going to be staying in the U.S. and working, that would not lead to their desire to retaliate against him. It's the knowledge that he's working with the United States government and basically exposing their abuses to the U.S. government and then gets returned, and now those specific officers know that he has been talking about their misdeeds. That's what the retaliation is. I'm sorry. Go ahead, Your Honor. This is for kids. I hate to keep interrupting you, but I want to know your views before – because we're going to have to decide what I consider a fairly important case. I understand that I'm going to know what my colleagues think because we're going to confer. I'd like to hear what you think, and that's why I was asking you to tell us specifically why we should reverse and grant relief. What in this record would justify that result? Okay. Well, there are several things. First, the issue that the issue of whether or not he's going to be tortured simply by virtue of being arrested has just never been addressed. That must be addressed. It's central to his claim. Is that the cat? I'm sorry? Is that the cat? That is the cat. Okay. Then also in terms of the credibility, in terms of the credibility issue, there are so many factual errors underlying the judge's determination in this case that it can't hold water. And I know Judge Friedman earlier stated that any credibility finding that is supported would be sufficient to uphold the credibility ruling. But that's not how I read the recent case of Bondarenko, which states that if the judge does not differentiate between the different ways in which it found a person not credible, and any one of them might have possibly changed the judge's credibility ruling if not upheld on appeal, then that credibility finding must be reversed. And here, I mean, I just would like to point you to the briefing. All the many, many factual errors that the judge made, for example, when Mr. Aruino explained that he was simply he simply testified to the wrong date of one of his arrests and omitted an arrest that was never intended to be part of his cat claim. She makes arguments such as, well, that wouldn't make sense that your counsel would advise you to omit that arrest if later she's going to submit evidence to support it. Well, of course, those were two separate arrests. She was putting evidence into the record about the arrest that she had told him to omit. Or there's more mistakes where the judge says, well, the medical records are problematic because they talk about an arrest in July of 1997, but he testified that he was only kicked around in July of 1997, and, of course, that's not correct. He said he was only kicked around in July of 1996, or the judge stated that he never mentioned the July 1997 arrest in his opening statement, and yet it was right there in his opening statement. And so what all these factual errors that the judge made reveal is that what she actually believed was that he had just made up this 1997 arrest out of whole cloth on remand, which then became the central part of his case. But that's not the case. That had always been part of his case. The reason I ask you the question, though. Okay. Normally, if we would find a problem, we would just reverse and remand for reconsideration. Yes. You're asking that we do more than that. Yes. And if we do more than that, would we base it on this record? And if we did do that, wouldn't we be usurping a position that normally the board If there is fact-finding that this Court deems necessary, then it should remand to have the board consider these issues that haven't been considered. However, if the record compels but one conclusion, this Court certainly has the authority to do that. And also, while I haven't had a chance to mention them, but I'd also just like to point out in terms of the credibility ruling, there were multiple times that the government had the burden to put on certain individuals for cross-examination, whether that be Rose Karanja from the Kilimani Police Department or the chief officer from the Bar Obra Police Department or Ms. Carr, who was Mr. Erwino's former counsel. And as a result, all of these errors, and many more included in the brief, infected the credibility findings such that it can't be upheld, and that's Doesn't it pose a problem for you, though, that at least if we follow existing case law, this record would have to compel the conclusion? And I think the government's going to say that no matter how we look at it, we can't say compels. She's going to come to her butt. You won't be able to talk after she finishes. So but don't you have to consider that as you tell us what we should do? Well, at worst, Your Honor, then this case needs to be remanded to the board. All right. Thank you. Thank you. Good morning again, Your Honors. May it please the Court. Sherry Glazer appearing on behalf of the United States Attorney General. Before I begin, I'd just like to clear up a few things that I disagree with with regard to what Mr. Erwino's counsel just said. I don't agree with any of the errors that she alleges the immigration judge made. She alleges the immigration judge relied on Mr. Erwino just misstating a date of an arrest. Mr. Erwino did not just misstate the date of the arrest. He added a new arrest. And in adding this new arrest, he inserted this new arrest into when he said the first arrest happened, the 10-day arrest, and then changed the date of that. And in doing that, he changed the circumstances surrounding the 10-day arrest. It no longer happened when Mr. Erwino worked at a bike shop when he was allegedly arrested at this bike shop, taken into arrest for now a different amount of time under different circumstances. And then he alleges after this arrest that the police padlocked the bike shop, that he had to get the padlock taken off, that the police shoot his customers away, and that's why he moved to Nairobi. This arrest now happened well after he moved to Nairobi, after he started attending university, after he joined the track and field, and he started traveling with the team. And it's not just misremembering a date of an arrest. It's completely changing his story. He also, with respect to the arrest that wasn't in the previous claims, he said that his attorney had told him to admit that arrest? That's his argument. And what was the government's evidence in rebuttal to that? The rebuttal is, you know, he claimed before the agency, and he even admitted this in his reply brief, that he was asserting ineffective assistance to the counsel claim, and he didn't meet any of the Wazata requirements to do that. And in her, in Mr. Ueno's reply brief, he argues that, well, during one of the hearings, the immigration judge said, perhaps that's a reasonable explanation, but if you look at that page in the record, unfortunately, I don't remember what it is right now, but the immigration judge did say, you know, well, perhaps that could be reasonable, and then she went on to say, but I'm going to withhold any ruling until I'm able to look at all of the evidence in the case, and as Your Honors are aware, it's extremely dense factually. And when she went back to look at it, you know, she included that in her credibility finding and found that it wasn't a reasonable explanation. Could I ask you to address the reports? Sure. As I understand it, the government, and I use this in a large term, has the consular people, and can you go out to the police station and say, is this arrest record? There's several documents. Is this arrest record one that came from you? And the people in the police station provide a letter that's eventually sent in, and that letter is admitted into, those letters are admitted into evidence. Fair? Yes. Okay. Two questions, I guess, in my mind. First, is this a violation of 208.6? Doesn't it necessarily tell the local police when people representing the U.S. government come to them and ask if arrest records are valid that somebody has filed an asylum application? I don't believe so. The test in this particular circumstance is whether disclosure gives rise to a reasonable inference that this particular individual was applying for asylum-related relief. In this case, you know, he's applying for CAT. And in this case, the disclosure occurred 12 years after the alleged events that Mr. Ruino is saying had happened. And in addition, his cousin specifically, she testified, and in her declaration said that she only convinced the police officials to give her these particular documents for employment purposes abroad. And then State Department officials show up wondering whether these documents are authentic or not or whether they were distributed. Well, one of my problems with the cousin's declaration, I thought your opponent was going to say this, is that if the documents were fraudulent, then the cousin really didn't do that at all. Well, that is true. So you can't have it both ways. You can't assume the credibility of her testimony and then. That is true. But looking at, you know, the information that we have, it's not unusual for State Department employees then to, you know, investigate documents. Do we know anything about what the local employees said to the police officials? Did they testify? The local employees? The local contractors, if you will. The embassy employees? Yeah. The former police officers. The former police officers did not. But there are five or six individuals from the embassy that very specifically testified as to the chain of custody and how these requests went through. And contrary to what Mr. Aruino's counsel said, it was not a situation where the two individuals, Phineas Machiro and Julius Norberts, that were in direct contact with the police officers, neither of them just sent the letters to the police station and had letters sent back to them. Both of them personally drove the letters over and drove the letters over. The original letters that were introduced by Mr. Aruino? The letters that were sent to them from the immigration, yeah. Basically showed them the letters in person. And said, you know, are these authentic? Right. Do we have testimony about that? Yes. From those very people? Yes, from those very people. And the testimony from those very people, and I thought we did, the testimony from those very people, did they say what they said to the local police officers? In other words, put aside whether or not the evidence had sufficient foundation to come in, I'm focusing on the 208.6 issue. Do we know what they said? We don't know the exact words. We just know that he personally drove them over, and we know kind of what tasks they were given to find out about the documents, but what specifically they said. Nobody made they were available to testify, but nobody made a record of they said, well, we're from the U.S. government or? No, no. Would the local officers have known they were from the U.S. government? Officer Lewis did testify that it's commonplace in Kenya for State Department employees to go through the process of authenticating documents due to passport fraud and whatnot, so I would imagine that they were. But the question is this. What we have is a letter from the Kenyan police, right? That comes into evidence. The Kenyan police are not available for cross-examination. If the consular officers or even the former police not only talked about the chain of custody, we went and showed them the letter, but said, well, you've admitted this letter from them directly, but I also interviewed them. I also had a conversation with them, and this is what they said to me. It may be hearsay. It may be more than hearsay, double hearsay or something, but that's okay. But at least if you and I have a conversation, if one of us is present to talk about what you – if I can say what you said to me, he can cross-examine me about it. But if all I can say is I showed her a letter and then I asked her to write a letter in response, that doesn't give him much to cross-examine about. And there is a record on this. I just want to know – well, we'll have to go take a look at it. I just want to know your recollection of it. Yeah, it was just that, you know, I personally drove this letter over to the particular police station. I gave it to them. They asked me to – they said they'd look at it and ask me to come back. You know, I went back. I think – I don't remember which individual went back the next day to pick it up and picked up the letter and drove it back. Yes. This gets to the foundation question I'm interested in, which is that I don't doubt that you've sufficiently established the chain of custody and the authenticity of these letters. The question is what about their reliability. How do we know they're reliable? Well, there's nothing in the record to show that they're not reliable. And in terms of an argument that Mr. Ueno seems to now be asserting and seems to have asserted in his reply brief that I don't recognize was asserted before the agency, or in his opening brief that his due process rights have been violated due to their unreliability, that's simply not an argument that was ever made. And to the extent that it's made now, you know, he failed to exhaust it, and he also waived it. There's a fact that's kind of hovering in the background in this case that we don't always have, and that's we have a person who has remained in confinement for a period of eight years, rather than go back to his country. Now, that doesn't carry the day. It may not prove anything. But when you have that fact kind of moving around in the background, the government, it seems to me, has to come forward with some pretty concrete statement as to why we should not remand the case for further hearing. Now, if you agree with me that that's so, you don't have to discuss them. Just tell me the points. One, two, three, four. Do you understand what I'm asking you to do? I do. I do. All right. Will you please do it? Okay. The first point is Mr. Ueno was not a credible witness. He changed his story between his 2006 hearing and his 2010 hearing, and there are several inconsistencies that are set out in our brief and set out in the agency's decisions regarding his detentions and the alleged injuries he suffered, and he submitted the fraudulent documents. That would be my first point. My second point would be, you know, when dealing with a cat claim in this Court, even if there's an adverse credibility finding, there's sort of a parallel finding that needs to be made that the immigration judge did make, that notwithstanding the adverse credibility finding, just looking at the objective evidence in the case, looking at whether it's more likely than not that the individual will be tortured when returned to Kenya. And the agency specifically found, you know, Mr. Ueno claimed that he had been arrested and detained in the past because of his support for Raila Odinga, because of his support for civil rights for women, and because of his outspokenness against the government and corruption. And the immigration judge went through all the evidence and specifically found that, well, you know, he claims he supported Raila Odinga in 1997, and the record specifically states that in the forward Kenya party that she was not a member of the forward Kenya party. It was not a situation like Mr. Ueno claims, that the party split. It was a situation where she joined the national development party, and I'm sorry, he, and that's who he was a candidate for in 1997. So the objective evidence doesn't support that he'll be tortured based on that claim. And there's just simply no evidence at all, looking at the objective evidence, that individuals who support civil rights for women are tortured or mistreated in any way at all in Kenya. And looking at his outspokenness against the government, you know, he's spoken to the media. That's his claim. And there's no evidence in the record that people speaking to the media are tortured in any way at all. Journalists are, yes, but not the sources of the articles. So my second point would be the objective evidence, you know, fails to show that there's more likely than not that he will be tortured. My third point would be on the confidentiality issue. I think the stronger argument for the government, even assuming without conceding that the disclosure did breach his confidentiality, Mr. Ueno's claim in his closing statement before the agency. Kennedy did breach his confidentiality, don't you think? I would disagree. But just assuming that it did, the second part of that is. They may have had a reasonable argument as to why they did it, and they may not have even realized that that's what they were doing. But the fact is, when you look right at it, they did breach his confidentiality. Even assuming that. We look. That's sort of the first part of the question with regards to confidentiality. And the second part is, well, looking at the argument that the individual makes as to how he, the alien needs to bring an independent claim for protection under the CAT due to the disclosure. Why is that? Because the Second Circuit said so? Well, otherwise, really what it would be a situation is an alien could, you know, bring a CAT claim and then say, well, my confidentiality was breached. But if the new claim for torture is not independent of his original claim, it would just be a situation where the Court's remanding to give the alien a second bite at the apple of the claim that he's already had a full chance to present. But isn't a claim in this case, and I want to make sure you get to make all your points here, but isn't a claim in this case, if he is arrested, he will be tortured? And the I.J. seemed to, and I'm not sure this is a clear finding, the I.J.'s finding was based on the notion that I don't find it more probable than not that you're going to be arrested if sent back to Kenya. Is that fair? Based on the arguments that he made? Based on your lack of credibility, I don't think you're. But did sort of concede that conditions in Kenyan jails were such that people who were arrested were liable to face brutal treatment? That is true, but there's no evidence that he will be arrested. All right. That's my point. The whole thing turns on, the whole credibility determination turns on whether or not he is likely to be arrested. Wasn't there an arrest warrant out for him? Which was found to be fraudulent. What about the arrest warrant he tried to introduce? Well, that was from a town that he didn't testify to ever being in. And it was a warrant, you know, because he failed to appear in court. But there was no information in it as to, you know, what it was for. It could have been for something very simple. And so, you know, the immigration judge found, look, it doesn't resolve any of the credibility issues. And she did in her denial of motion to admit evidence. She didn't just say, I'm ready to rule and you're just too late. No, she did put out a shorter decision because she had already put together the other  one. I want to go back to what Judge Furst was asking you because that's what I was trying to follow up on. If, in fact, the entire case turns on whether or not he's likely to be arrested or more probable not to be arrested if returned to Kenya, and the Kenyan police now know that he's been lying about them, in their view, because he submitted false documents in the United States, does that make it, is he entitled to a hearing about whether that would, that the government's breach of his confidentiality would subject him to the likelihood of torture? No, because, you know, if you look at his closing statement and you look at his opening brief to this Court, you know, in his reply brief he makes a different argument, but his argument was that his confidentiality was breached and now he's more likely than not that he will be tortured because this article was published in America and individuals in Kenya know about that article and the police have been looking for him. But that's the same as his original claim, that he's been talking to the media and it's more likely than not that he will be arrested, but he never makes the specific argument that, okay, well, you know, my, all this information was disclosed to the Kenyan government and because of that disclosure I'm more likely or it's more likely than not that I will be tortured. He never argues that. So just remanding this case. He never argues it before us or anywhere? In his reply brief, that's it, but he didn't argue it in his opening statement and he didn't on page 55 to 56 of his opening brief. When did he first raise the 2.08 argument? He raised that before the agency, but the claim that the new cat claim or allegedly new cat claim that he argued, other than in his reply brief, was just based on him talking to the media. So remanding the case is just going to give Mr. Ueno a third bite at the apple over something that he's had five years and 23 merits hearings to present. And, Your Honors, this case needs to come to an end at some point. He hasn't presented anything new with regards to that claim and give a reason to remand on that basis. I think I started asking questions when you said you were on your third point, and so I want to make sure that you got the rest of them done. Did you have any other points? The other two points would just be regarding the motion to admit evidence that he has had, you know, five years, 23 hearings. Well, actually, he only had from May to September, because in May was when the evidence came in that the arrest warrants were fraudulent. And so he had to do something to counter the view of the I.J. and the view of the government that he was engaging in fraud on the court and presenting fraudulent documents. So he immediately sent somebody out and got this new warrant between May and September, which was a lot less time than it took the government to test whether or not the earlier warrants were fraudulent. So he didn't have five years. He didn't have 11 years. He had from May until September. Well, I respectfully would disagree, because it's the alien's burden to bring forth all evidence in support of his claim. And Mr. Ueno cites a case, let's name that case. I can't pronounce it. It's the MKR-TCH-YAN case to say that this Court has held when an alien wants to submit rebuttal evidence when documents have been found to be fraudulent, and an alien tries to submit rebuttal evidence that the agency erred in not allowing the rebuttal evidence to be admitted, but that case was completely different. And in that case, the rebuttal evidence that the alien was submitting was evidence showing that the documents were, in fact, not fraudulent, and that's just not the case here. And what was your last point? Oh, I guess the ineffective assistance to counsel claim, that would be my fifth point, that he didn't meet the Lozada requirements and that was properly denied. Okay. Thank you. Thank you. Thank you. Counsel will give you, where was she on the clock? We'll give you two minutes to finish up, because we extended. Okay. Government counsel's argument. I just wanted to talk a little bit about the 208.6 argument, and government counsel states that the FSN actually went to the station, drove the letter over, talked to the individual about her findings, Rose Karanja, and then went and then took her letter back, and that's not what happened. If you look at his testimony, he just mailed it to her. She filled out her report, and he did drive and pick that up, but there's no evidence that the FSN actually went to the station and discussed her findings with her at all. Do we have any record? Was there anything that accompanied the letter than when it was mailed to somebody? Did he make a phone call first and then mail it to her? I'm sorry? You say he just mailed it to her. Yeah, I believe so. I don't remember him testifying that he called her and then explained it to her. Did he just, does this arrest warrant appear in the mail without any previous indication? I don't know. So the government wouldn't produce any of the other documents or e-mails or communications that it had with any of its other, with the FSNs, so we don't really know if there were other communications. We don't really know if there were other documents or e-mails because they refused to produce that. But what I wanted to also point out was that the cross-examination of Ms. Karanja or the chief of the Baraba police would have been very significant in this case, and as Sanapian points out, sometimes that's the only way that a person, a Petitioner, can rehabilitate not only the authenticity of their documents, but also then their credibility. In the cross-examination here, we could have asked Ms. Karanja, we could have asked her, you know, how she searched for the records, what name she searched on, because there's evidence that she searched under the wrong name. We could have asked him what her relationship was or whether she knew Mr. Officer Kamau, who is the one, who is specifically the one that Mr. Owino claims tortured him. We could have asked whether she receives any pressure from the Kenyan officials to make findings that the warrants are fraudulent when the U.S. Government brings them. And specifically, we could have asked her. Kennedy, what do you think the answer to that would be? Well, you know, I don't know. You know, when she's on her own, I would like to think that she does. Go ahead with the argument. But of course, it didn't happen. Well, and we could have also asked whether she inferred that there was an asylum investigation going on. And with respect to the motion to admit evidence, I just wanted to also point out that Judge Friedman was absolutely correct that he only had a few months in order to rebut these findings, that it wasn't until May that any evidence – well, actually, it wasn't until April that the government even mentioned that they had even looked into the bar-over warrant, let alone put any evidence on with respect to the investigation of the bar-over warrant. And so at that point, the due process analysis in the Bondarenko case becomes applicable and is a reason that this case needs to be remanded for further consideration. Thank you, counsel. I thank both sides for their arguments and briefs in this interesting case. And the case will be submitted.
judges: Friedman, Farris, Hurwitz